IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | | |
|---|---|---|
| SHERMAN BROWN, | ) | |
| Petitioner, | ) | |
| | ) | Civil Action No. 7:16-cv-00576 |
| v. | ) | |
| | ) | By: Elizabeth K. Dillon |
| BERNARD W. BOOKER, Warden, | ) | United States District Judge |
| Respondent. | ) | |

**MEMORANDUM OPINION**

Petitioner Sherman Brown, a Virginia inmate proceeding by counsel, filed a petition for

writ of habeas corpus, pursuant to 28 U.S.C. § 2254, challenging his Albemarle County Circuit

Court conviction for first-degree murder on May 25, 1970, when he was 23 years old.  (*See*

Amended Petition (Am. Pet.), Dkt. No. 19.)  Initially sentenced to death, the death penalty was

vacated by the United States Supreme Court on June 29, 1972, but the conviction was upheld.

*Brown v. Virginia*, 408 U.S. 940 (1972).  On remand, Brown was sentenced to life in prison.

(Trial Tr. (Tr. #2) 508 (Nov. 7, 1973), Ex. F to Pet., Dkt. No. 1-9.)[1]  The Respondent has filed a

motion to dismiss the petition, and Brown has filed a response, making this matter ripe for

disposition.

Brown's petition raises two claims: (1) new evidence establishes his actual innocence,

and (2) introduction of invalid scientific testimony violated his right to due process and

undermined the fundamental fairness of his trial.  (Am. Pet., Dkt. No. 19.)  Upon consideration

of the record and arguments of counsel, the court finds that Brown has failed to establish his

---

[1] Both parties have attached many state court pleadings and other documents as exhibits to their briefs.
(*See* Dkt. Nos. 1, 19, 38, & 49.)  For convenience the court cites to the briefs' exhibits, where possible, using the
ECF-generated page numbers when a page cite is appropriate.  "Va. Sup. Ct. R." will refer to citations to the
combined Virginia Supreme Court record of Brown's state habeas case (Record No. 161422) and his state petition
alleging actual innocence (Record No. 161421) using the page numbers in the lower left corner, "page __ of 803."

freestanding claim of actual innocence.   With respect to the second claim, the court also finds

that Brown has not satisfied the standard for using his actual innocence claim as a gateway to

reach otherwise procedurally defaulted constitutional claims.   *See Schlup v. Delo*, 513 U.S. 298

(1995).   Accordingly, for the reasons stated below, the court will grant respondent's motion to

dismiss, deny the petition, and decline to issue a certificate of appealability.

## I.   BACKGROUND

### A.  Factual Background

#### 1.  The crime and the crime scene

On October 1, 1969, at 4:55 p.m., Mrs. B.'s sister-in-law[2] walked next door to Mrs. B.'s

home to see if the phone was off the hook.   She walked in to find Mrs. B. lying in a pool of blood

in the living room floor, near the kitchen door.   The phone was hanging from the wall, with the

wires ripped from the wall and the receiver broken into two pieces.   Mrs. B. was weak and could

not talk very loudly, but she seemed coherent and spoke briefly to her sister-in-law.   After

getting Mrs. B. a rag, the sister-in-law left to call her husband and the rescue squad from a

neighbor's phone.   (Trial Tr. (Tr. #1) 95–100, Ex. B to Pet., Dkt. No 1-5.)

She returned to Mrs. B.'s home to await the rescue squad, and while waiting, asked

where the children were.   She removed Mrs. B's unharmed 2-year-old son from his crib in the

front bedroom and took him outside to be with her own children.   She then walked to the back

bedroom and saw her 4-year-old nephew lying face down in the bed.   She could tell that he was

seriously hurt but did not know if he was dead.   She did not move the child or disturb the scene

---

[2] The names of Mrs. B., her husband, her father, her brother-in-law (husband's brother), and sister-in-law
were all redacted in the trial transcripts.   Her son's name was replaced with the initials "W.B."   Presumably, her
husband and in-laws had the same last initial, and her father's last initial cannot be determined from the record.   For
this reason, each of these witnesses will be identified based on their relationship to Mrs. B.

and returned to the living room.  Her husband and Mrs. B.'s husband then arrived, followed immediately by the rescue squad.  (*Id.* at 100–03, 112.)

Maynard Strickler and James Bingler, volunteers with the rescue squad, were dispatched to the B. home at 5:05 p.m., and they arrived on scene between 5:15 and 5:20 p.m.  While Bingler started assisting Mrs. B., Strickler went to the back bedroom to check on the child, where he determined that the boy had no signs of life.  (*Id.* at 124–25.)  Bingler saw no blood on Mrs. B's back, but there was a lot of blood coming from somewhere.  Needing help to turn her over, he called for Strickler.  As they turned Mrs. B. over, a knife flipped up into Bingler's face, the blade still stuck in Mrs. B's side.  Because they are trained not to remove foreign objects, if possible, they unsuccessfully tried to stop the bleeding and bandage the wound without removing the knife, which had no handle.  They determined that they had to move the knife in order to put enough pressure on the wound to stop the bleeding.  Mrs. B. was weak, mumbling, and possibly bleeding out.  She was dressed in a nightgown and robe, with no underwear on.  Bingler cut a square out of her nightgown, with the blade through it, and Strickler removed the patch and blade.  (*Id.* at 142–46.)

Strickler went to get the stretcher from the ambulance; while outside, he called the Sheriff's office and then notified the hospital that an emergent patient was on the way.  In order to make room to place Mrs. B. on the stretcher, he had to move the coffee table and rug; he used his foot to move a pair of panties from under the coffee table, pushing them to the edge of the couch.  (*Id.* at 128.)  After placing Mrs. B. on the stretcher and into the ambulance, the rescue squad workers dropped her off at University of Virginia Hospital before responding to another call.  (*Id.* at 146.)

Dr. Alrich, the surgeon on call when Mrs. B. arrived at University Hospital, examined her and operated on her. He testified that she had stab wounds on her lower back, her chest, and the right side of her upper abdomen. Although her chest and pleural cavity showed no internal wounds, her abdominal cavity was full of blood. She appeared to be bleeding out through a vein from her liver, and he had to stop the bleeding. Once he stopped the bleeding and removed the blood from her abdomen, he determined that a stab wound had sliced all the way across the right lobe of her liver. She was also bleeding from the pedicle of her spleen, where the artery and vein enter, and he removed the spleen. He closed her surgical incisions and stitched up the wound in her back. He noticed two major lacerations on the top of her head, down to her skull, which he also cleaned and closed. These were consistent with a blow to her head. Finally, he called the gynecology department to perform an exam. (*Id.* at 115–21.)

Dr. Wiecking, the medical examiner, testified about his autopsy of W.B., Mrs. B.'s 4-year-old son, who had been declared dead by Dr. Ooghe at 5:30 p.m. on October 1, 1969. Wiecking examined the body in the home at 6:00 p.m. and later at the University Hospital Morgue, where he also performed the autopsy. W.B. had suffered two stab wounds in his chest, just to the left and right of midline, both of which pierced the heart; either wound alone would have been fatal within one to five minutes. W.B. had a stab wound through his left armpit into his left chest and lung and a stab wound through his right wrist. He had blood inside his lung and chest cavity. He also had two lacerations on the back of his head, down to the bone, another laceration above his left ear, and a fourth laceration on his scalp. Finally, W.B. had several bruises that had occurred somewhere between minutes and one day before his death, including two in the middle of his forehead, one above his left eyebrow, behind his left ear, on the back of his right shoulder, and on his arms and legs. He estimated time of death between 30 minutes or

4

an hour before he saw the child and several hours earlier. On cross-examination, he acknowledged that the body cools 1 to 1.5º Celsius per hour after death. Normal is 37º, and W.B.'s temperature at 7:30 p.m. was 33º. He also acknowledged that it would not take a lot of strength to cause the injuries to the child. (*Id.* at 75–92.)

Deputy Guthrie of the Albemarle County Sheriff's Department was the first law enforcement officer on scene, after receiving a call from the rescue squad. En route to the home, he passed the rescue squad taking Mrs. B. to the hospital. When he entered the home, he saw a lot of blood and furniture in disarray. After speaking with Mrs. B.'s sister-in-law and brother-in-law, Guthrie returned to his cruiser and requested additional officers to assist. He also requested a lookout for Ike Brown,[3] along with a description of Ike Brown's vehicle. Chief Deputy Sheriff George Bailey arrived on the scene, and within five minutes, according to Guthrie, Bailey told him the suspect was Sherman Brown, not Ike Brown, and the lookout notice was corrected. Guthrie was not familiar with either Ike or Sherman. (*Id.* at 366–68.)

Chief Deputy Bailey arrived around 5:35 p.m. and began taking notes five minutes after he arrived. According to his notes, at 5:45 p.m., the people present in the house when Bailey arrived were: Mrs. B.'s sister-in-law and her husband (Mrs. B.'s brother-in-law), Dr. Ooghe, Rev. Boogher, Deputy Guthrie, and Deputy Cobbs. W.B.'s body also remained. Mrs. B. had already been taken away by ambulance, her husband riding along with her. Bailey first spoke with Mrs. B.'s sister-in-law, and after speaking with her, he notified dispatch that the suspect to look for was Sherman Brown, not Ike Brown; he provided a description of Sherman and Sherman's car. Bailey stated that he knew both Ike and Sherman before that day. He had two officers on scene, Deputy Cobbs and Deputy Bunch, go over to Dry Bridge Rd., where Sherman

---

[3] Ike Brown was defendant Sherman Brown's father and lived across the street from Mrs. B. (Tr. #1, at 44, 56–57, & 153.)

lived with his wife, mother-in-law, and her family.  He sent Deputy Marshall and Deputy Davis to look for Sherman.  Mrs. B.'s sister-in-law was not feeling well, and she and her husband left after Bailey finished speaking with her.  (*Id.* at 55, 59–63.)

Bailey walked through the home on his own to observe the scene, and then he called for a photographer, Rip Payne, and the medical examiner.  Between 6:30 and 6:45, the photographer took pictures of the deceased child and the wounds, as well as pictures of the boy's bed, the hallway, and the washer and dryer, showing blood in each location.  In the living room, he took pictures of blood on the end of the sofa, on the carpet, and in splotches dripping down the wall behind the sofa.  Other pictures were taken of pieces of a knife blade, the knife removed from Mrs. B. and the piece of cloth cut from her gown, a busted telephone sitting on the end table, an overturned lamp on the floor, a crushed paper cup and broken ashtray from under the sofa, ladies' panties, a pipe, and a child's scarf, all on the floor.  In the kitchen, he photographed a partially open silverware drawer, the kitchen cabinets, and the sink.  After the photographs were taken, Bailey collected, bagged, and marked the evidence.  (*Id.* at 49–54.)

At trial, other witnesses who were asked did not remember seeing several of the items on the living room floor that evening.  Mrs. B.'s sister-in-law did not see the lamp, scarf, panties, pipe, or paper cup, though she remembered seeing some water spilled on the coffee table.  She recognized the picture of the broken phone, but said it was not on the end table when she saw it, but it was hanging from the wall by the kitchen.  (*Id.* at 108–10.)  The paramedic who moved the panties off the rug when he moved the rug and coffee table did not see a paper cup.  (*Id.* at 130.) Everyone, of course, remembered seeing the blood.

## 2.  The investigation

At the Chief Deputy's direction, Deputies Marshall and Davis went to the Boar's Head Inn, where Brown worked, to look for Brown.  They arrived at 6:15 p.m. and asked a man in the hallway if Brown was there.  Upon being directed to the kitchen, they saw someone wearing a white shirt and dark trousers and asked if he was Brown.  Brown confirmed his identity and was cooperative.  They told him he was wanted for questioning and gave him his *Miranda* warnings, and Brown walked with them voluntarily to the police car.  Brown appeared calm, and there was nothing unusual about him—no bruises, scratches, or other injuries.  (*Id.* at 207–12.)

Marshall and Davis drove Brown to the driveway of Mrs. B.'s home, and Chief Deputy Bailey got in the front seat and turned around to talk to Brown, who was seated in the backseat. Bailey left the front car door open.  He asked Brown if he had been read his rights, and Brown said yes.  Nevertheless, Bailey reviewed the warnings again and asked Brown if he understood them.  Bailey asked Brown if he had been on Mrs. B.'s property that day, and Brown said that he had not.  Bailey asked no other questions, and Brown made no other statements.  Bailey did not tell Brown what had happened to Mrs. B. and W.B., nor did he give any information about why he was questioning Brown.  After Brown denied being on Mrs. B.'s property, Bailey directed Marshall and Davis to take Brown to the Charlottesville jail.  (*Id.* at 213–15.)

Sometime after 6:00 p.m., as it was getting dark, Deputy Bunch went to the Waller home, where Brown was living, and wanted to take Brown's clothes.  Mrs. Waller watched Bunch go through the clothes, pick them up to look at them, and then stuff them in a pillowcase.  She said they took clothes from the clothes hamper and from Brown's closet, and they even took a pair of pants belonging to Helen (Mrs. Waller's daughter, defendant Brown's wife).  (*Id.* at 270–74.) Bunch testified that he got clothes from Brown's bedroom, from a closet, and a stack from

another room, all with Mrs. Waller's permission; Brown's brother, Vernon, identified which clothes were his and which ones were Brown's.  Bunch acknowledged that in all locations, the clothes were touching other clothes, and he corroborated putting the clothes in a single pillowcase, except for jackets on coat hangers, which he carried.  Bunch then took the items to Bailey at the Sheriff's Office.  (*Id.* at 283–84.)

Bailey examined the items of clothing and marked them for identification.  He put each item in a plastic bag, sealed the bag, and turned the items of clothing over to the FBI for examination.  On October 2, the day after Brown's arrest and Bunch's seizure of clothing from Mrs. Waller's home, Bailey went back to Mrs. Waller's home.  While he was there, Mrs. Waller gave him a blue sweatshirt that she found in either her son Larry's room or her daughter Eloise's room.  Larry was present when Mrs. Waller gave Bailey the sweatshirt, which Bailey put in a plastic bag with an evidence card and sealed it for delivery to the FBI.  (*Id.* at 269–70, 285–86.)

At some point not identified in the transcript, Bailey and other law enforcement personnel questioned Larry Waller about the events of October 1.  A school bus driver, Eddie Howard, had seen Larry running from the vicinity of Mrs. B.'s driveway in the afternoon.  Deputies told him he was a suspect in the crime and that he would go to the penitentiary if he did not cooperate.  They took samples of Larry's hair to send the FBI.  Larry told them that Brown had been wearing the blue sweatshirt on October 1, the same sweatshirt his mother gave Bailey on October 2, even though the shirt was Larry's and had Larry's name written inside it.  (*Id.* at 251–53.)

Bailey forwarded all evidence collected to the FBI, including the clothing taken from Brown's room and elsewhere in Mrs. Waller's house, the nightclothes worn by Mrs. B. when she was assaulted, the pajamas worn by W.B. at the time of his death, and the miscellaneous items scattered about Mrs. B.'s floor and living room.  The items were submitted for blood, fingerprint,

hair, and fiber analysis.  The FBI returned the clothing to the Sheriff's office, along with scrapings from clothing mounted on sealed glass microslides, on October 21, 1961.  In November, the Sheriff's office returned the items to the FBI, along with samples of Brown's hair.  Brown's hair was mounted on microslides, and the original microslides were examined and resealed.  All items were returned to the Sheriff on November 24, 1969.  On January 15, 1970, the items and sealed slides were sent to the FBI again, with a sample of Larry Waller's hair. When the FBI finished examining the slides against new slides with Larry Waller's hair, the resealed microslides were returned to the Sheriff on February 9, 1970.

### 3.  The trial evidence against Sherman Brown

Mrs. B. testified that she had spoken with Sherman Brown on two occasions prior to October 1, 1969.  First, a couple of months earlier, she got a call from a person who identified himself as "Sherman" or "Sherman Brown", who said he lived across the road and was looking for outdoor work; she said she did not need any.  Although she had never seen Sherman in the six and a half years she had lived there, she knew that the Brown family lived across the road. (*Id.* at 152–53, 171.)  Then, on a Sunday in early September, she was outside watching W.B. play in the yard when she saw a man jogging around the front field; although the field was part of her property, it was customary for kids in the neighborhood to play or run in the field, nothing unusual.  He stopped at the fence and asked if they needed anyone to do yardwork.  Although she had never seen him before, and he did not identify himself nor refer to the earlier telephone conversation, she thought she recognized the voice.  She asked about his sister Rosie, and they talked about the weather, and he asked if he could come inside the fence.  She said yes, and he jumped over the fence and sat in a lawn chair.  He did not have anything to drink, but he borrowed a cigarette from her.  They continued making small talk, and he mentioned that he had

9

been in the service in Viet Nam.  She asked if he had been in combat, and he did not answer.  He never mentioned having any adjustment issues after returning from Viet Nam.  After conversing about 15 minutes, she indicated that she needed to cook dinner, she got up to go inside, and he got up and left.  She acknowledged that the encounter had been friendly and polite, nothing improper.  (*Id.* at 153–55, 173–76.)

She had no other contact with this person until she received a phone call on October 1, asking if he could come over and talk.  At the time she received the call, her father was visiting at her home.  She said no and that it was not convenient that day or the next.  He was persistent, saying that he was very confused.  She remained firm, saying either that her father was there or that she had a visitor.  She was "a little shaken" by the call (*id.* at 156), but she returned to the conversation with her father and forgot about it.  On cross-examination, she initially denied trying to keep her father from knowing what the conversation was about, but when pressed about her testimony at the preliminary hearing, she admitted that her dad was furious about the conversation and felt like she was being guarded.  She said he asked what the call was about, and she said, "You wouldn't believe it if I told you."  (*Id.* at 185.)

Mrs. B. testified that her father left about five minutes after she got off the phone.  Prior to her father's arrival, she had put her two-year-old in his crib for a nap.  She had put on a gown and robe to lie down (keeping her underpants on) and read to her four-year-old, hoping that he would fall asleep.  She had been reading for a while, then turned off the light, when she heard a car coming in the driveway.  She looked out and saw that it was her father.  She and W.B. went to the front door to greet him, and he asked for a glass of wine, which was unusual.  She got him a glass, and they talked for a little while.  She does not know what time this was, because she had

10

no reason to look at a clock.  After he left, she and W.B. headed back to the bedroom, intending
to take their nap.  (*Id.* at 150–52, 181–83.)

Her father testified that he arrived at her home between 2:45 and 2:50 p.m.  He said that
she had not been home long and was getting ready to put W.B. down for a nap.  He does not
recall what she was wearing.  He had been there for five or ten minutes when she got a phone
call.  He heard her say "No, I can't see you today."  (*Id.* at 202.)  Otherwise, he really was not
listening, because he was playing with W.B.  When she got off the phone, he asked, "Someone I
know?" and she replied, "No. And you'd be surprised."  (*Id.* at 203.)  He finished his wine and
put the glass on the coffee table, leaving about half an hour after he arrived, because he had to
leave for a business trip that evening.  (*Id.* at 201–05.)

When Mrs. B. returned to her room to start her nap, she had started to unfasten her robe
when she heard the front gate open (closest to the driveway).  She looked out the window and
could not see anyone, but she did not want someone to knock on the door and wake the baby up
(whose bedroom was in the front of the house, right off the living room).  There were two knocks
on the door before she and W.B. got there.  Having no peephole, she opened the wooden door a
crack and looked out to see Sherman Brown standing there, holding the screen door slightly
open.  He wanted to talk and asked to come in.  She said no, that she needed to get her child
down to nap.  Finally, he asked if he could have a drink of water.  She went to the kitchen and
got him a paper cup of water; when she returned, he had stepped inside the door.  He started
drinking the water, and she asked him to leave so she could get W.B. to bed.  She said it became
obvious that he wanted to talk about problems between Blacks and Whites.  Then, he admired
her living room and asked if he could see the rest of the house.  She said no.  He said if she ever
sold it, he would be interested in buying it.  Then, out of the blue, he asked if she would have sex

with him.  She said, "Of course not."  (*Id.* at 162.)  When he asked why not, she said something to the effect of she was married, and he was not her husband.  She also said that little ears were listening, referring to W.B., who was standing right there the whole time.  He said, "I'm so sexed up, I don't know what to do."  She responded, "I'm sorry, you'll have to go somewhere else.  I'm not available."  (*Id.*)

Her next memory is feeling painful blows in her side and feeling like she was pitching forward.  Then, she woke up on the floor and tried to move, but she was in too much pain.  She remembered her sister-in-law coming in, but she did not know that her sister-in-law left to call for help.  She does not remember anyone else being in the house or arriving, but she remembers being in the ambulance and hearing the siren, as well as small bits of being in the emergency room.  (*Id.* at 163–67.)  On cross-examination, she acknowledged that she had no memory of any hostile action by this man.  She never saw him put his hands on her or lunge towards her.  In her last memory, he was standing at least six feet away from her, and she does not associate that memory with the blow she felt in her side.  In fact, she does not recall seeing anyone when she felt the blow to her side.  (*Id.* at 198–200.)

The first time that Mrs. B. saw or identified Sherman Brown after October 1, 1969, was at the preliminary hearing on January 24, 1970, when the defendant was the only Black person in the courtroom.  In the words of counsel, objecting to the Commonwealth's failure to hold a lineup during its investigation: "There are no colored people even present in this court room.  The assailant was obviously colored, and the defendant is colored."  (Prelim. Hr'g Tr. 2, Ex. G to Pet., Dkt. No. 1-10.)

William Thomas Waller, a first cousin of Brown's wife and of Larry Waller, spent the morning with Brown and Larry on October 1, 1969.  Just before 2:00 p.m., he dropped Larry and

Brown at the home of Brown's father.  That was the last time he saw Brown that day.  (Tr. #1, at 216–22.)  Larry testified that he and Brown played records in the basement, then went outside to lift weights.  Larry had no concept of time and could not say when they arrived at Brown's house or how long they played music or lifted weights, but after lifting weights, Larry was listening to records and heard Brown on the phone.  (*Id.* at 224–26.)  He does not know who Brown was talking to or who called whom, but he heard Brown say something about "I have talked to you before about a problem."  (*Id.* at 226.)  A little later, they went across to the field for Brown to run some laps, as part of his training exercise routine.  Brown was physically in excellent shape; weightlifting and running were regular parts of his routine.  After Brown ran three or four laps, Larry stopped him to say that he was going up to the Murray School.  Larry had been planning to do this all day, because he wanted to see a girl named Tina, but he had not mentioned it to Brown.  Larry started to walk, but then saw Eddie Howard's school bus coming, so he ran to flag him down and rode the bus to the Murray School.  He thought it was 3:15 or 3:30 when he caught Howard's bus.  Brown had returned to running around the field, still wearing the blue sweatshirt and green work pants, like Army fatigues.  (*Id.* at 226, 228, 233–35, 245, 254.)

Tina's bus usually departed Henley at 3:15 and arrived at the Murray School at 3:40, where she changed buses.  To get home, she had to ride the rest of the way on Eddie Howard's bus, which departed Murray School at 3:45.  Larry got to speak to Tina for about five minutes before she had to leave on Howard's bus, and then he caught the bus driven by Bruce to get to his home, which was not far from the Murray School.  He recalled that Mrs. Bailey, the Murray School principal (and wife of Chief Deputy Bailey) chastised him for riding the school bus since he had dropped out of school and was no longer attending.  When he got off the bus, he agreed to carry Thelma Whiting's books for her; she lived three houses down from him.  He watched some

television at her house for about 20 minutes, shot a couple of baskets outside, then walked home, arriving before 4:30. Brown was already home, washing up[4] and getting ready for work. He had on his dark work trousers but had not yet put on his shirt. Although Larry does not remember what the two talked about, he remembers Brown saying, "I messed up." He did not know what Brown was talking about, and he did not ask. Larry's cousin, Henry, worked at the Boar's Head Inn with Brown, and picked Brown and Larry up. They dropped Larry at University Hospital, where he worked, around 5:15 or 5:20 p.m. (*Id.* at 240–41, 245–52.)

As he had told the police during the investigation, Larry identified Exhibit 33, a blue sweatshirt with "Larry W." written inside the shirt, and he said that Brown was wearing the sweatshirt on October 1, 1969, including when he was running around the field beside Mrs. B.'s house. (*Id.* at 227–28.) On cross-examination, Larry testified that he did not know when the shirt had last been washed. He also admitted that he suffered from chronic nosebleeds, and he could not say whether he had a nosebleed while wearing the sweatshirt. (*Id.* at 239.)

Eddie Howard, school bus driver, testified that he picked Larry up in front of Mrs. B.'s house, where he saw Larry talking to Brown on the edge of the driveway and roadway. He said that he arrived at the Murray School at 3:15, as always, and waited for the bus from Henley to arrive at 3:30, then departed Murray School at 3:40 after transfer students were on the bus. (*Id.* at 255–58.) Elizabeth Bailey, principal at Murray School and wife of Chief Deputy Sheriff Bailey, testified that Howard's bus arrived at 3:15 on October 1, and students were dismissed from school at 3:30 to begin boarding busses. She remembered seeing Larry around 3:30; he got off Howard's bus and left on Bruce's bus at 3:40 p.m. Mrs. Bailey admitted that she had discussed the case against Brown with her husband. (*Id.* at 263–65.) Finally, Thelma Whiting, a

---

[4] The Waller home did not have indoor plumbing, so Brown was bathing from a basin with water drawn outside and then heated up inside. (Tr. #1, at 250–51.)

student at Albemarle High School, testified that she lived four houses up from Larry Waller, and on October 1, 1969, she and Larry got off Bruce's school bus at the same stop.  Larry carried her books home, stayed and watched television for 25–30 minutes, and then left around 4:15 or 4:20.

The Commonwealth Attorney then put on a trio of FBI expert witnesses, the first of whom was Agent Stombaugh, a hair and fiber examiner and 19-year veteran of the FBI who had testified as an expert in more than 300 trials.  He testified that he examined hairs taken from the blue sweatshirt and compared them under a microscope, looking to compare 15–25 different characteristics, with hair samples from Brown and hair samples from Larry Waller.  He testified that he found eight hairs from the sweatshirt that matched Larry Waller and two that matched Brown.  (*Id.* at 304–07.)  While stating that hair analysis was not the same as fingerprint analysis, he said that if all the hair characteristics matched, he could say "the hair originated from either this person by the hair sample or from another individual of the same race whose hairs are *identical*."  (*Id.* at 305 (emphasis added).)  The government did not leave the opinion there, but asked, "In all of your experience in this field, have you ever found hairs that were identical except when they came from the same individual?"  Stombaugh replied, "No sir, I have not." (*Id.*)

Agent Stombaugh's testimony then turned to fiber analysis.  He testified that he used a research microscope to examine fibers on clothing, and that the microscope's magnification and wavelengths of light enabled him to determine both the color and shade of fibers with his naked eye, without any further testing.  However, he noted that some synthetic fibers, particularly various acetates and rayons, appear similar, so a microchemical process is necessary to distinguish the fiber type.  (*Id.* at 305–06, 325.)  Stombaugh found blue delustered triacetate fibers on the sweatshirt that matched the fibers from which Mrs. B's bathrobe was made.  He

also found many blue cotton fibers on Mrs. B.'s robe, which matched the blue cotton in the

sweatshirt.  He then testified that he had examined a pair of gold trousers identified as having

been found in Brown's clothing.  The trousers were made of gold wool fiber and gold delustered

dacron fibers.  He found both types of those gold fibers on Mrs. B.'s robe, and he found the blue

delustered triacetate fibers matching Mrs. B.'s robe on the trousers.  Finally, he found gold wool

fibers matching the gold trousers on W.B.'s pajama bottoms.  He did not find any Caucasian hair

on Brown's clothing, nor did he find any Negroid hair on either victim's clothes.  (*Id.* at 308–09,

314–15.)  Stombaugh was not concerned that Brown's trousers had been in a pillowcase with

many other items of Brown's clothing, as long they had not had contact with the victims'

clothing between seizure by the Sheriff and arrival at the lab.  (*Id.* at 310–12.)

To determine the exact type of synthetic fibers in Mrs. B.'s robe and in the gold trousers,

Stombaugh first performed a test in glacial acetic acid to distinguish rayon from acetate.

Because a sample of the fibers dissolved in the acetic acid, he knew he was dealing with a type

of acetate.  He then put a sample of fibers in chloroform, where they also dissolved, indicating

that the fiber was triacetate instead of a secondary acetate fiber.  To double check, he put another

sample of the fibers into a 70% acetate solution; in this, secondary acetates will dissolve

completely, but triacetate will not.  The 70% acetate solution will cause all the color to bleed

from the triacetate, so that the microscope is necessary to see the almost invisibly clear naked

fiber.  (*Id.* at 321–22.)

The defense aggressively cross-examined Stombaugh on the fiber analysis.  Stombaugh

maintained that the delustered fibers found on the sweatshirt and trousers were identical to the

fibers from which the robe was made, and that the blue cotton fibers and various gold fibers

found on Mrs. B's robe and W.B.'s pajamas were identical to the fibers from which Brown's

clothes were made, although he admitted that the fibers did not necessarily come from the same clothes. Stombaugh claimed that triacetate is "not too common," but then admitted that over 50 companies make triacetate clothing, and he had no idea how many yards of triacetate material are made each year. Stombaugh did not perform any chemical tests to determine whether the triacetate was dyed during the manufacturing process or whether it was dyed after the fabric had been made; he said he could usually tell from his visual examination, but he did not remember for these fibers. He ran no chemical tests to determine color or dye lot, although such tests are available, claiming that he ran the "industry standard" tests, which was all he needed to do. Finally, Stombaugh admitted that most manufacturers put a tracer in their fabrics, so that with neutron activation, the actual manufacturer of a fiber could be identified, but he did not perform that test, either. (*Id.* at 323–32.) Stombaugh also admitted that two items of clothing did not have to touch each other for fibers to contaminate. (*Id.* at 333.)

Cornelius McWright, a blood and bodily fluids examiner with 15 ½ years working for the FBI, ran tests to analyze anything that looked like blood on the victims' clothing, the sweatshirt and trousers, and items found in Mrs. B.'s home, such as the ashtrays, knife blades, etc. He found human blood, Type A, on the following items: ladies' underpants, scarf, knife blade, square material cut from housecoat, handkerchief (from clothes taken from Mrs. Waller's home), brown ashtray, black ashtray, broken ashtray, pillowcase, nightgown, bathrobe, boy's t-shirt, boy's pajama bottoms, and boy's undershorts. (*Id.* at 336–39.) He found spots of human blood too small to type on a jacket from Brown's closet, five pieces of broken knife blade, undershorts from the hamper in Brown's bedroom, the blue sweatshirt, and the broken telephone. The only blood spot on the sweatshirt was on the right shoulder, and no semen was found on the sweatshirt. On the trousers, small spatters of blood on the bottom of the pant legs were too small

to distinguish between animal blood and human blood.  (*Id.* at 340–42.)  McWright testified that there were not any reliable tests for RH factor in dried blood samples, so he was unable to determine whether any of the blood was A positive or A negative.  (*Id.* at 349.)  Mrs. B., W.B., and Brown all had Type A blood.  (*Id.* at 353.)

The state's final expert was William Carman, an FBI fingerprint examiner for 19 years. Carman examined a wine bottle, wine glass, broken telephone, knife blades, and brown ashtray from the crime scene.  He saw smudged prints, but none sufficiently clear to identify.  He indicated that smudges and smears were normal, and that the scene had not been "wiped down" to remove prints.  (*Id.* at 356–63.)

**B.  Procedural Background**

**1.  Initial trial and appeal**

Following his arrest on October 1, 1969, and preliminary hearing on January 24, 1970, Brown's three-day jury trial began on May 21, 1970.  After hearing the evidence summarized in the previous section, the jury convicted Brown of first-degree murder of W.B., the sole charge against Brown, and sentenced him to death.[5]  The court entered judgment on the verdict on May 25, 1970.  (Order of Conviction, May 25, 1970, Resp't's Mot. to Dismiss, Ex. 1, Dkt. No. 38-1.) He appealed to the Supreme Court of Virginia, challenging sufficiency of the evidence, admission of medical examiner photographs of W.B., voir dire questions regarding attitudes towards the death penalty, and the government's use of a peremptory strike to remove the only African-American juror on the panel.  His appeal was denied on all issues.  *Brown v. Commonwealth*, 184 S.E.2d 786 (Va. 1971).  He petitioned the United States Supreme Court for

---

[5]  At the time of this trial, the jury heard evidence in a single trial, returning verdict on guilt or innocence and imposing the sentence at the same time.  There was no bifurcated trial.

certiorari, which was granted; the Court vacated the death sentence but affirmed the conviction. *Brown v. Virginia*, 408 U.S. 940 (1972).

### 2.  Resentencing trial

At the time Brown was charged, first-degree murder carried a penalty range of either 20 years to life or death.  Va. Code § 18.1-22 (1950 & Supp. 1960).  Therefore, a new jury was impaneled to determine Brown's sentence on remand.  On November 7, 1973, the parties read the transcript of the entire May 1970 trial to the jury.  (Tr. # 2, at 23, 43–392.)  The defense then introduced live testimony from character witnesses to vouch for Brown's reputation for honesty and veracity and his reputation as a law-abiding person in the community.  The witnesses who testified were his sister, his father, and Florence Wheat, a lady in the community who had been Rev. Boogher's housekeeper for 40 years.  (*Id.* at 410–22.)  The defense offered the testimony of Rev. Charles Kramer (President of the Presbyterian School of Christian Education), Floyd Profit (Asst. Supervisor of textiles in the Virginia State Penitentiary [VSP]), Sgt. Ernest Roberts (shift officer at the VSP), Rev. Ottie Brown (minister at Second Baptist Church in Richmond), and Chaplain Walter Thomas (VSP Chaplain), all of whom knew and had worked with Brown during his time in the VSP after the first trial and had very positive opinions about his reputation among inmates and staff.  The court did not allow any of this testimony, however, having ruled that "anything relating to the character of [sic] the attitude or the rehabilitation, if any, of the defendant since the imprisonment, the Court will not allow it as proper evidence before the jury." (*Id.* at 394.)  While the jury was out, the testimony of these witnesses was taken for the record. (*Id.* at 83–97, 487–507.)

Brown also testified on his own behalf at the re-sentencing trial.  Raised in Ivy, Virginia, and Mount Calvary Baptist Church all his life, Brown left school in the 11th grade.  He joined the

19

Army for four years, during which he was stationed in South Carolina; Ft. Eustis, Virginia; Viet

Nam; and Ft. Knox, Kentucky.  He married in 1966 and had one daughter, who was born in Ft.

Eustis before he went to Viet Nam.  He was in Viet Nam from 1967–68.  When he returned from

Viet Nam, he was stationed at Ft. Knox.  Prior to that time, his record in the Army had been

exemplary, with no disciplinary problems.  When he returned to the United States, however, he

began experiencing readjustment problems.  Because of mouthing off threats to a supervisor and

later to a non-commissioned officer, he was court-martialed and sentenced to three months in the

stockades (each time).  During his second incarceration, he and four other inmates tried to steal

Darvon (medication) from the pharmacy, but they got caught.  He was transferred to a different

stockade, where a Lieutenant came to talk with him.  Brown was "talking with his hands" while

he spoke, and the Lieutenant told him to stand at attention and stop moving his hands, but the

longer they talked, the more nervous Brown became.  The more nervous he became, the more he

talked with his hands, and he told the Lieutenant he could not stop.  He was court martialed for

disobeying a direct order and received an undesirable discharge from the Army in July 1969.

(*Id.* at 428–31, 433–39.)

Brown also acknowledged difficulties in personal relationships when he came home, with

his wife, his mother, and his sister.  He said he felt that he had changed in Viet Nam, including

questioning the faith in which he was raised and reading more about Islam, which grieved his

mother a lot.  Despite his personal difficulties, Brown secured employment at Acme in Crozet,

Virginia, during the day and at Boar's Head Inn during the evenings.  He held both jobs until his

arrest on October 1, 1969.  (*Id.* at 432, 440–45.)

Brown also testified, over the government's objection, that he did not kill W.B., never

assaulted Mrs. B., and never went into her home.  He did not speak to her on October 1, did not

20

ask her to have sex, and did not ask for a cup of water.  He denied joining her and W.B. in the

yard in early September, talking with her, and smoking a cigarette.  He said that he would never

have considered jumping over the fence and joining her family after running in the field.  When

asked on cross-examination, he said he could not explain how fibers from his pants got on

W.B.'s pajamas, because he never went there.  (*Id.* at 445, 448–51.)

The jury sentenced Brown to life in prison.  He apparently did not file another appeal.

(Resentencing Order, Resp't's Mot. to Dismiss, Ex. 4, Dkt. No. 38-4.)

### 3.  State post-conviction proceedings

On October 7, 2016, Brown filed two post-conviction proceedings in the Supreme Court

of Virginia: Petition for Habeas Corpus, Record No. 161421 and Petition for a Writ of Actual

Innocence, Record No. 161422.  His state habeas petition alleged violation of his due process

rights by introduction of false and scientifically flawed testimony about hair comparison and

fiber analysis.  (Va. Sup. Ct. R. at 40.)  The primary basis for his actual innocence petition was

the new DNA evidence, obtained from a vaginal smear slide prepared at University of Virginia

Hospital on October 2, 1969, following the October 1 gynecological exam of Mrs. B. requested

by the Sheriff's Office while Mrs. B. was being treated for the injuries she sustained in the

attack.  (*Id.* at 241a, p.2.)  The slide was found in a hospital storage area in 2015, and the

Albemarle County Circuit Court entered an order for the Division of Forensic Science (DFS) to

examine and test the slide for DNA evidence.  (Supp. Disc. Order No. 4, Jan. 14, 2015, Ex. J. to

Pet., Dkt. No. 1-13.)  The DFS lab used differential extraction on a portion of the slide's

material, separating the material into a "sperm fraction" and a "nonsperm fraction" (or epithelial

fraction).  The lab developed no DNA profile from the sperm fraction of the vaginal slide and

developed a profile of no value from the non-sperm fraction.  (DFS Lab Rpt., May 19, 2015, Ex.

K to Pet., Dkt. No. 1-14.)  The court then ordered further analysis at Bode Laboratories.  (Supp.

Order No. 5, July 17, 2015, Ex. L to Pet., Dkt. No. 1-15.)  Drawing another portion of material

from the slide and using the same differential extraction technique, Bode was able to obtain a

partial Y-STR of male DNA from the epithelial (non-sperm) fraction of the slide.  (Bode Lab

Rpt., Feb. 19, 2016, Ex. M to Pet., Dkt. No. 1-16.)  Subsequently, Bode received a sample from

Brown's buccal swabs in March 2016 and from W.B.'s shirt on June 9, 2016.  In a report dated

August 25, 2016, Bode reported that Brown could be excluded as a contributor to the male

genetic material on the vaginal smear slide, and based on W.B.'s profile, Mrs. B.'s husband

could be excluded with greater than 98% certainty.  (Bode Supp. Lab Rpt., Aug. 25, 2016, Ex. O

to Pet., Dkt. No. 1-18; Jennifer Fienup Aff., Ex. P to Pet., Dkt. No. 1-19.)  A supplemental

report, correcting mis-transcription of the name on the DNA profile for W.B., reported that W.B.

and Brown were both excluded as contributors to the male genetic material on Mrs. B's slide.

(Bode Supp. Lab Rpt., Sept. 6, 2016, Ex. N to Pet., Dkt. No. 1-17.)

Brown's actual innocence petition also proffered new evidence challenging all forensic

evidence used against him at his trial.  First, Brown's attorney received a letter dated October 9,

2015, from Norman Wong, Special Counsel, U.S. Department of Justice, regarding the joint

DOJ/FBI Microscopic Hair Comparison Analysis Review.  The letter included a form captioned

"Result of Review" prepared by the FBI Microscopic Hair Comparison Analysis Review Team,

indicating that Agent Stombaugh's hair analysis testimony in Brown's case "stated or implied

that the evidentiary hair could be associated with a specific individual to the exclusion of all

others.  This type of testimony exceeds the limits of science."  (Letter from Norman Wong to

Olga Akselrod, Oct. 9, 2015, Ex. A to Pet., Dkt. No. 1-4.)  In September 2015, the Attorney

General's Office wrote to Senator Richard Blumenthal to advise on the progress of FBI review

of the thousands of cases in which hair comparison analysis testimony had been used; in that letter, Assistant Attorney General Kadzik noted that the United States had no jurisdiction to intervene in state criminal cases, even if erroneous FBI testimony had been used.  However, Kadzik stated that in federal cases, "in the interests of justice . . ., the government will not dispute that the erroneous statements should be treated as false evidence and that knowledge of the falsity should be imputed to the prosecution."  (Letter from Peter J. Kadzik to The Honorable Richard Blumenthal, Sept. 15, 2016, Ex. FF to Am. Pet., Dkt. No. 19-7.)  Kadzik indicated that state prosecutors would receive the federal government's position in the letters accompanying the results of file reviews, and Wong's letter to Brown's counsel included a copy of his letter so advising the Albemarle County Commonwealth Attorney.

Brown also included an affidavit from Skip Palenik, an expert on fiber analysis, to state that an instrument known as a microspectrophotometer had been developed after the time of Brown's trial.  This instrument revealed severe deficiencies in fiber examination based only on comparison microscopes, leading forensic scientists to conclude that the "use of comparison microscopy alone . . . is virtually useless since our results show that approximately one in seven blue, one in three red, and one in four black cottons may be expected to match.  Discrimination is so poor that the results are of little value as evidence."  M.C. Grieve et al., *An Assessment of the Value of Blue, Red, and Black Cotton Fibers as Target Fibers in Forensic Science Investigations*, 33 J. Forensic Sci. 1332, 1340 (Jan. 1988).  Palenik states that the FBI has required the use of microspectrophotometry in fiber comparisons since 2001, and that Agent Stombaugh's methods lacked any scientific basis.  He also stated that Stombaugh's testimony was misleading because he did not acknowledge how commonly the fibers were used, nor did he

quantify the number of fibers examined.  (Skip Palenik Aff., Oct. 4, 2016, Ex. D to Pet., Dkt. No. 1-7.)

Brown also included information in his innocence petition that a 2012 DFS examination of the sweatshirt, pants, and underwear used against him at trial did not identify any blood on either item, contrary to the testimony of Agent McWright that human blood was on the right shoulder of the sweatshirt and small amounts of blood spatter were on the bottom of the trousers, too small to determine if it was human blood or animal blood.  (Va. Sup. Ct. R. at 241a, p. 14.)

Finally, Brown argued that several factors undermine the strength of Mrs. B.'s identification of him.  First, her first contact with Sherman Brown was by telephone, not in person, and her only other contact with the person she believed to be Sherman Brown occurred a month prior to the assault, for 15 minutes, and the man did not identify himself, but she thought she recognized his voice.  Fifteen minutes of observation, a month earlier, is a slim basis for identification, especially cross-racial identification.  Next, her in-court identification of Brown as the perpetrator was made under highly suggestive circumstances, since he was the only African-American in the courtroom and was sitting at the defense table.  A final factor he raised was that Mrs. B. suffered a head injury in the assault that affected her memory.  (*Id.* at 241a, pp. 42–49.)

By order entered April 11, 2019, the Supreme Court of Virginia dismissed Brown's habeas petition as untimely, noting that the habeas statute of limitations in Virginia Code § 8.01-654(A)(2) makes no exception either for claims of actual innocence or for newly discovered evidence.  *Brown v. Booker,* 826 S.E.2d 304, 307 (Va. 2019).

The state court denied the actual innocence petition by opinion dated March 22, 2018.  *In re Brown,* 810 S.E.2d 444 (Va. 2018).  The court based its decision on two alternative grounds. First, the court stated that the statute required the court to consider only lab reports prepared by

or certified by the Virginia Department of Forensic Sciences. *Id.* at 456. Second, even if the court considered the DNA evidence, the overall evidence was insufficient to prove by clear and convincing evidence that no rational factfinder would find Brown guilty. *Id.* at 459.

### 4. Parole proceedings

Brown made various inculpatory statements to the parole board. During a parole interview in 1991, Brown stated, "I accept full responsibility for my crime and I feel sorry for the victim, but I can't undo what's been done." *In re Brown*, 810 S.E.2d at 451. In a 1985 parole interview, Brown expressed "fervent regret and remorse." *Id.* In a 1984 interview, Brown offered a detailed statement to the parole board explaining how the crimes occurred. After a bout of "drinking alcohol" and "taking some LSD," he approached Mrs. B at her home knowing that she did not want to see him. After Mrs. B gave water to Brown, she "turned into a snake." In a later parole interview, he recalled standing over Mrs. B with the "knife handle in his hand." *Id.* Further, in the 1984 interview, Brown admitted telephoning Mrs. B before he arrived at her house. (Ex. HH to Am. Pet., Dkt. No. 19-9.)

Brown recalled feeling like he was "tripping" at the time of the offense. He could not specifically remember stabbing Mrs. B and murdering her son, but he remembered that he had blood all over him and he knew something was wrong. *In re Brown*, 810 S.E.2d at 451. Brown told the parole board in 1991 that he thought he "committed the crimes, stabbed Mrs. B and killed her 5 y/o son." *Id.* Brown discussed the circumstances of the crimes because he knew what drugs and alcohol can do to a person and did not want another young child's life taken in vain. *Id.*

**5. Current claims**

Brown's petition, filed on December 9, 2016, and amended on June 10, 2019, raises two

claims:

(1) New evidence establishes his actual innocence, and

(2) Introduction of invalid scientific testimony violated his right to due process and

undermined the fundamental fairness of his trial.  (Am. Pet.)

II.  DISCUSSION

**A.  Procedural Requirements**

As amended by the Antiterrorism and Effective Death Penalty Act (AEDPA), the federal

habeas statute requires state prisoners to meet several procedural hurdles before a federal court

may grant relief.  First, the petitioner must timely file his claim.  28 U.S.C. § 2244(d).  Next, he

must exhaust his state court remedies before filing in federal court.  28 U.S.C. § 2254(b)(1)(A).

**1.  Timeliness**

Under 28 U.S.C. § 2244(d), a petitioner has one year in which to file a federal habeas

corpus petition.  This statute of limitations runs from the latest of:

(1) (A) the date on which the judgment became final by the
conclusion of direct review or the expiration of the time for
seeking such review;

(B) the date on which the impediment to filing an application
created by State action in violation of the Constitution or
laws of the United States is removed, if the applicant was
prevented from filing by such State action;

(C) the date on which the constitutional right asserted was
initially recognized by the Supreme Court, if the right has
been newly recognized by the Supreme Court and made
retroactively applicable to cases on collateral review; or

> (D) the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.
>
> (2)   The time during which a properly filed application for State post-conviction or other collateral review with respect to the pertinent judgment or claim is pending shall not be counted toward any period of limitation under this subsection.

*Id.* The sentencing order after Brown's resentencing trial, dated November 8, 1973, was not appealed. Therefore, it became final on Monday, December 10, 1973, 30 days after it was entered. Clearly, the date on which his initial § 2254 petition was filed, December 9, 2016, is decades later. Brown has not alleged any new constitutional rights nor that state action prevented him from filing. Rather, he alleges that the one-year statute of limitations should run from the date he received information constituting the factual predicate for his claim, which he could not have discovered earlier in the exercise of due diligence. The FBI's admission that its agent in Brown's case had offered testimony "exceed[ing] the bounds of science" was not and could not have been known to Brown until receipt of Wong's October 9, 2015, letter.

DNA testing was not available for decades after Brown's conviction, and the slide containing the vaginal smear was not found until 2015. Prompt and multiple efforts to have the material evaluated for DNA finally resulted in the exculpatory DNA report he first received on August 25, 2016.

For purposes of the one-year statute of limitations, Brown became aware of the factual basis for the improper hair analysis testimony on receipt of Wong's October 9, 2015, letter. Upon investigating that claim, his attorneys looked further into the fiber evidence claim, since the same expert witness offered both opinions. However, Brown's trial attorney was aware of other tests that could be performed on the fibers in 1970 (Mot. Tr. (April 14–15, 1970), Resp't's

27

Br. in Supp. of Mot. to Dismiss, Ex. 19, Dkt. No. 38-19) and the microspectrophotometer had been standard FBI protocol for fiber examination since 2001.  (Skip Palenik Aff., Oct. 4, 2016.) Brown became aware that the vaginal slide provided DNA evidence exculpatory to him on August 25, 2016.  His state petitions for actual innocence and habeas corpus relief were filed October 7, 2016, within one year of learning about the false hair evidence and the DNA evidence.  However, he or his attorney knew or should have known of the unreliability of the fiber evidence at least 15 years before he filed his state habeas petition, and that claim is time barred under § 2244(d).

Brown filed his § 2254 petition in this court on December 9, 2016, and moved to stay the petition while he finished exhausting his remedies in state court.  The DNA claim was thus filed within less than four months after Brown learned the factual basis for the claim, and thus, the DNA claim is timely.  The question is whether the filing of the state petitions tolls the statute of limitations on the false hair evidence.

The statute provides for tolling of the limitation period while a properly filed application for State post-conviction relief is pending.  Specifically, "[t]he time during which" the application is pending "shall not be counted toward" the limitation period.  28 U.S.C. § 2244(d)(2).  Unlike § 2244(d)(1), § 2244(d)(2) does not delay when the statute starts running. Rather, the statute started running when the defendant knew or should have known of the new evidence, but the clock is stopped when a *properly filed* state post-conviction application is pending.  When the state action is no longer pending, the clock resumes at the point where it was when it stopped; the statute does not begin anew.  *Harris v. Hutchinson,* 209 F.3d 325, 327 (4th Cir. 2000).  If the statute has already fully run before the state action is filed, the state collateral proceeding can no longer toll the federal filing period, as there is nothing left to toll; the state

action does not "revive" the one-year limitation period.  *Wahl v. Kholi*, 562 U.S. 545, 547 (2011).

The Supreme Court has long recognized that a petition untimely filed in state court is not "properly filed."  *Artuz v. Bennett,* 531 U.S. 4, 11 (2000).  If the state petition is untimely under state law, "'that is the end of the matter' for purposes of § 2244(d)(2)."  *Pace v. DiGuglielmo,* 544 U.S. 408, 414 (2005) (internal citation omitted).  The state court specifically held that Brown's state habeas petition was untimely.  *Brown*, 826 S.E.2d at 305.  That does not end the inquiry, however, because Brown had filed a state Petition for Writ of Actual Innocence simultaneously with filing his state habeas petition, and that petition was properly filed and decided on its merits by the state court.

The question becomes whether the Petition for Writ of Actual Innocence qualifies as a state "post-conviction or other collateral proceeding."  The Supreme Court has noted that habeas petitions are not the only post-conviction collateral pleadings that toll the federal habeas statute of limitation.  *Wall v. Kholi*, 562 U.S. 545, 551 (2011).  In *Wall*, the Court specifically recognized that motions to reduce a sentence and coram nobis petitions are also collateral proceedings that will toll the statute.  *Id.* at 552–53.  Likewise, the Fourth Circuit Court of Appeals has recognized a state mandamus as a collateral proceeding that can toll the statute. *Harris v. Director*, 282 F. App'x 239 (4th Cir. 2008) (unpublished).  The *Wall* Court explained that a collateral proceeding is any request for judicial review of a case that is not part of the direct review process.  Although the collateral proceeding may challenge the validity of a judgment, it need not do so.  562 U.S. at 551.  Brown's state petition alleging actual innocence seems to fall squarely within that definition of collateral proceeding; the petition is certainly not an appeal or part of the direct review of his original case, and the petition requires judicial review

29

of the proceedings.  Therefore, the petition is a collateral proceeding that tolls the statute of limitations.

The next issue is whether the statute is tolled only for that portion of Brown's claim alleging actual innocence, as argued by the respondent.  (Resp't's Br. in Supp. of Mot. to Dismiss, 42–44, Dkt. No. 38.)  That issue has not been decided by the Supreme Court or the Fourth Circuit Court of Appeals, but the other circuits considering this issue have now unanimously concluded that a collateral proceeding tolls the statute of limitations for the entire habeas petition, not just for parts of it.  A federal habeas petition may not even raise the same issues raised in the state collateral proceedings, but the properly filed state collateral proceeding still tolls the statute.  As stated by the Court of Appeals for the Third Circuit:

> We hold that under § 2244(d)(2), a properly filed state post-conviction proceeding challenging the judgment tolls the AEDPA statute of limitations during the pendency of the state proceeding. Whether the federal habeas petition contains one or more of the claims raised in the state proceeding does not matter as long as the state proceeding and the federal petition attack the same judgment.

*Sweger v. Chesney*, 294 F.3d 506, 520 (3d Cir. 2002).  *See also Cowherd v. Million,* 380 F.3d 909, 913–14 (6th Cir. 2004) (overruling *Austin v. Mitchell,* 200 F.3d 391 (6th Cir. 1999)); *Ford v. Moore,* 296 F.3d 1035, 1040 (11th Cir. 2002); *Carter v. Litscher,* 275 F.3d 663, 665 (7th Cir. 2001); *Tillema v. Long,* 253 F.3d 494, 503 (9th Cir. 2001), *overruled on other grounds by Pliler v. Ford*, 542 U.S. 225 (2004).

Because the state petition seeking a writ of actual innocence qualifies as a collateral proceeding, the statute of limitations on Brown's federal habeas was tolled when the state petition was filed on October 7, 2016.  At that time, the statute of limitations had not expired on either the DNA claim or the erroneous hair comparison testimony raised in Brown's § 2254 petition.  The state petition was still pending when the federal petition was filed on December 9,

2016, and then stayed pending the outcome of the state proceedings.  Because the state proceedings were still pending, the statute of limitations was still tolled, and the federal habeas was timely filed for the DNA claim and hair comparison testimony.  The matter of exhaustion, however, remains.

### 2.  Exhaustion

To exhaust his claims, a petitioner must present his federal constitutional claims to the highest state court before he is entitled to seek federal habeas relief.  *O'Sullivan v. Boerckel*, 526 U.S. 838, 842 (1999).  Failure to do so "deprive[s] the state courts of an opportunity to address those claims in the first instance."  *Coleman v. Thompson*, 501 U.S. 722, 732 (1991).  When a petitioner has no more state remedies available, his claim has been exhausted.  When the state court rules that petitioner has procedurally defaulted his claims, those claims are simultaneously exhausted and defaulted.  *Id.*

Clearly, Brown's claim of actual innocence was presented to and decided by the Supreme Court of Virginia on the merits, and thus, has been exhausted.  His remaining claims, however, are procedurally defaulted, based on the state court's determination that his state habeas petition was untimely.  These claims are simultaneously exhausted and defaulted, as they cannot be presented to any state court for further consideration.  When the state court "clearly and expressly bases its dismissal" of state habeas claims on procedural default under state rules, those procedural rules provide "an independent and adequate ground" for the federal court to dismiss them as well.  *Breard v. Pruett*, 134 F.3d 615, 619 (4th Cir. 1998).

A petitioner may overcome default, however, if he can show both cause for the default and actual prejudice as a result of the claimed federal violation.  *Coleman*, 501 U.S. at 750.  Cause for procedural default requires the existence of some objective factor, external to the

31

defense and not fairly attributable to the prisoner.  *Coleman*, 501 U.S. at 756–57.  If the factual

basis for the claim was not reasonably available to the prisoner at the time of his default, that

may constitute good cause.  *Reed v. Ross*, 468 U.S. 1, 15 (1984).  The DOJ's letter of October 9,

2015, to Brown's attorney, acknowledging for the first time that FBI agent Stambaugh's

testimony exceeded the bounds of science in Brown's trial, was Brown's first knowledge of the

facts underlying his due process claim for presentation of unreliable scientific evidence.  Because

the state's habeas statute of limitations makes no exceptions for newly discovered evidence,

Brown had no opportunity to present this claim to the state's high court, although he tried to do

so.  The court finds cause for his procedural default.

To show prejudice necessary to overcome procedural default, the petitioner must show

that the error worked to his "actual and substantial disadvantage, infecting his entire trial with

error of constitutional dimensions."  *United States v. Frady*, 456 U.S. 152, 170 (1982).  Scientific

expert testimony is often viewed by jurors as more credible, reliable, and impartial than other

forms of evidence and therefore can be "both powerful and quite misleading."  *Daubert v.

Merrell Dow Pharm., Inc.,* 509 U.S. 579, 595 (1993).  Nonetheless, the hair analysis testimony,

by itself, did not connect Brown directly to the crime scene.  No hair alleged to be Brown's was

at the crime scene, and no hair from either victim was alleged to be on Brown's clothing.  The

sweatshirt's owner, Larry Waller, was identified as having most of the hair on the sweatshirt, not

Brown.  Because Waller and Brown lived in the same household and any number of conclusions

can be drawn about how Brown's hair got on the sweatshirt, the court cannot say that the

testimony, even though completely unreliable, had any significant effect, by itself, on the overall

trial.

Although Brown has failed to establish the prejudice necessary to overcome this procedural bar, Brown can overcome his procedural default by establishing an actual innocence claim as a gateway to considering otherwise defaulted claims.

## B.  Actual Innocence Claims

Brown has raised two types of actual innocence claims, one referred to as a "freestanding claim of actual innocence" and the other known as a "gateway claim."  For the reasons set forth below, the court finds that the state court reasonably determined that Brown failed to establish a freestanding claim of actual innocence.  The court also finds that Brown has not satisfied the standard for using his actual innocence claim as a gateway to reach otherwise procedurally defaulted constitutional claims

### 1.  Freestanding actual innocence claim

In *Herrera v. Collins*, the Supreme Court recognized the possibility of a theoretical claim of actual innocence so compelling that even if his trial, conviction, and sentence were entirely fair and error free, his innocence would render his execution a "constitutionally intolerable event."  506 U.S. 390, 419 (1993) (O'Connor, J., concurring).  The Court's plurality opinion assumed that such right exists, for the sake of argument, but noted that the threshold showing for such a claim would be "extraordinarily high."  *Id.* at 417 (Rehnquist, J., plurality).  As a practical matter, no petitioner has ever made such a showing.

Brown's freestanding actual innocence claim was raised in his state petition seeking a writ of actual innocence and was decided on the merits by the Supreme Court of Virginia.  A federal habeas court may grant relief on a state claim adjudicated on the merits in state court only if the state court's decision was (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or (2)

"was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)-(2). A decision is contrary to federal law only if it reaches a legal conclusion that is directly opposite to a Supreme Court decision or if it reaches the opposite result from the Supreme Court on facts that are materially indistinguishable from the Supreme Court case's facts. *Williams v. Taylor*, 529 U.S. 362, 405 (2000). A state's decision is an "unreasonable application" of federal law only if the state court's ruling "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter,* 562 U.S. 86, 103 (2011). The question is not whether a federal court believes the state court's decision is incorrect, but whether the decision was unreasonable, which is "a substantially higher threshold." *Schriro v. Landrigan,* 550 U.S. 465, 473 (2007). Likewise, the federal court must presume that the state court's factual findings are correct, and this presumption can be overcome only "by clear and convincing evidence." 28 U.S.C. § 2254(d). Again, the federal court must find more than just an incorrect determination of facts, as "unreasonable determination of the facts" is "a substantially higher threshold." *Schriro*, 550 U.S. at 473.

The first basis for the state court's decision was that Virginia Code § 19.2-327.1 requires evidence to come from the Department of Forensic Science, not from a private lab. This is obviously a state statute and a state ground for the Virginia court's decision. As such, that decision is not subject to federal habeas review. *Estelle v. McGuire*, 502 U.S. 62, 67–68 (1991). Neither is the federal court limited by that state evidentiary rule, however.

The Supreme Court of Virginia did not rely solely on the state procedural ground, however. The court applied a "clear and convincing evidence" standard for determination of actual innocence on the merits, under which Brown must prove that "no rational trier of fact

34

would have found proof of guilt . . . beyond a reasonable doubt." *In re Brown*, 810 S.E.2d at 458. The United States Supreme Court used the same standard in *Sawyer v. Whitley* to consider whether that petitioner, who had filed multiple successive and abusive petitions, was actually innocent of the criteria that made him eligible for the death penalty. 505 U.S. 333, 336 (1992). The state court's use of this standard is reasonable, and as the respondent argued, if the Supreme Court ever considers a case to satisfy a freestanding innocence claim, the standard is likely to be at least as stringent as the clear and convincing standard. The state court purported to use a prospective approach, predicting what a rational factfinder would do at a new trial with all the evidence, old and new, whether admissible or not. *In re Brown,* 810 S.E. 2d at 459.

In order to evaluate the reasonableness of the state court's determination that Brown failed to meet the burden of proof on his freestanding innocence claim, it is necessary to know the facts determined by the court. The court started with the evidence from the original trial, which the court noted was a homicide case, not a rape case. Therefore, the court reasoned, proof that Brown did not rape Mrs. B. does not prove that he did not assault her and kill her son. The court noted that Mrs. B.'s testimony had been held reliable on direct appeal, including her identification of Brown, and that the evidence had been sufficient to support the verdict. Second, the court found the DNA evidence would probably be admitted, but the weight it would be accorded would be low because of the extremely small quantity available to measure, resulting in only a partial Y-STR strand, possible deterioration and degradation of the sample due to age, the inability to verify that the DNA came from sperm, irregularities in the chain of custody, and possible contamination of the sample. *Id.* at 453–55, 460–62, & nn. 16–22. Finally, the court considered the evidence of Brown's statements at his parole hearings in 1984, 1985, and 1991, in which he "accepted responsibility" and expressed remorse for his actions. *Id.* at 451–52, 460.

35

Notably, the state court did not discuss the false hair analysis testimony, the newer scientific developments demonstrating the unreliability of the fiber analysis testimony, or the recent analyses finding no blood on the blue sweatshirt or on the bottom of Brown's trousers, even though all this information was included in the state Petition for Actual Innocence.  (Va. Sup. Ct. R. at 241a, pp. 1–52.)

This court need not agree with the state court's factual findings or its conclusions of law. The court must only consider whether its findings of fact and conclusions of law are reasonable. This court cannot say that the state court unreasonably found that Mrs. B.'s testimony was sufficient to support the original verdict and that Brown's parole hearing statements contradicted his current claims of innocence, nor can one say that the court unreasonably found the probative value of the DNA evidence to be limited in weight, under the circumstances described by the court.  If the facts found by the state court are not unreasonable, then neither is the legal conclusion that the DNA evidence was insufficient to overcome the evidence against Brown by clear and convincing evidence.

Because the state court's decision is not unreasonable, this court must defer to the state court and cannot grant relief on the freestanding claim of actual innocence.  The court will dismiss this claim.

### 2.  Gateway claim

In *Schlup*, the court established a standard for an actual innocence claim to be a gateway to allow the court to consider otherwise untimely and defaulted claims.  513 U.S. at 329.  When a petitioner raises such a claim, supported by new reliable evidence, the court must consider all evidence, old and new, inculpatory and exculpatory, admissible and even inadmissible, to determine whether it is more likely than not that a reasonable juror would not find the petitioner

guilty beyond a reasonable doubt if all the evidence were presented.  *Id.* at 327–28.  Stated another way, the court must determine whether it is more likely than not that any reasonable juror would have a reasonable doubt.  *Teleguz v. Pearson*, 689 F.3d 322, 328 (4th Cir. 2012). Meeting this standard is exceedingly difficult.  "[T]he *Schlup* standard is demanding and permits review only in the extraordinary case."  *House v. Bell*, 547 U.S. 518, 538 (2006).

A petitioner seeking entry through *Schlup*'s gateway must "make a stronger showing than that needed to establish prejudice" because he does not come to the habeas court cloaked in the presumption of innocence.  *Schlup*, 513 U.S. at 326 n.42.  Rather, he comes "with a strong—and in the vast majority of cases conclusive—presumption of guilt."  *Id.*  Petitioner must present "evidence of innocence so strong that a court cannot have confidence in the outcome of the trial unless the court is also satisfied that the trial was free of nonharmless constitutional error." *McQuiggin v. Perkins*, 569 U.S. 383, 401 (2013).  Given the rarity of such evidence, "in virtually every case, the allegation of actual innocence has been summarily rejected."  *Teleguz*, 689 F.3d at 330.

A district court assessing a *Schlup* claim must examine all the evidence and make a threshold determination about the petitioner's claim of innocence that is separate from its inquiry into the fairness of his trial.  *Teleguz*, 689 F.3d at 330.  Relevant state court findings are "taken into account in the district court's analysis of the requirements set out in *Schlup*."  *Sharpe v. Bell*, 593 F.3d 372, 381 (4th Cir. 2010).  The district court "may make determinations about the probative force of relevant evidence that was either excluded or unavailable at trial, and assess how reasonable jurors would react to the overall, newly supplemented record, but the district

court may not reject the factual findings of a state court absent clear error." *Teleguz*, 689 F.3d at 332.[6]

The court begins by noting that fifty years ago, the Supreme Court of Virginia affirmed the sufficiency of the evidence against Brown, stating that a "detailed review of the evidence of the circumstances surrounding this murder and the evidence pointing to the defendant's guilt as the murderer leaves no doubt in our mind that this evidence, viewed in the light most favorable to the Commonwealth, amply supports the jury's verdict." *Brown*, 184 S.E.2d at 787.  Such evidence included Mrs. B's identification of Brown.  Two witnesses established that Brown was on Mrs. B's property after 3:00 p.m. on October 1, 1969, and Brown conceded his presence there to the resentencing jury.  Larry testified that Brown frequently jogged in Mrs. B's field, corroborating her account of her prior acquaintance with Brown.  Larry also corroborated Mrs. B's report that Brown telephoned her before he arrived at her house, a call that Brown admitted – in later parole proceedings – he had made.

Further, Brown made post-sentencing admissions during his parole proceedings, including that he went to Mrs. B's house after being told that she did not wish to see him.  Brown reported that Mrs. B gave him a drink of water.  The paper cup that Mrs. B gave to Brown was in Mrs. B's living room when Deputy Guthrie arrived.  Finally, Deputy Bailey testified that when asked if he had been on Mrs. B's property that day, Brown replied that he had not.  A jury could reasonably conclude that this false statement to the investigating officer was made to conceal Brown's guilt.

Brown also made additional inculpatory statements to the parole board.  During a parole interview in 1991, Brown stated, "I accept full responsibility for my crime and I feel sorry for the

---

[6] Neither party requested a hearing, and the relevant facts pertaining to DNA evidence, hair, and fiber are not disputed.  The parties dispute only the significance of those facts.

victim, but I can't undo what's been done." *In re Brown*, 810 S.E.2d at 451.  In a 1985 parole

interview, Brown expressed "fervent regret and remorse." *Id.*  In a 1984 interview, Brown

offered a detailed statement to the parole board explaining how the crimes occurred.  After a

bout of "drinking alcohol" and "taking some LSD," he approached Mrs. B at her home knowing

that she did not want to see him.  After Mrs. B gave water to Brown, she "turned into a snake."

In a later parole interview, he recalled standing over Mrs. B with the "knife handle in his hand."

*Id.*

Brown recalled feeling like he was "tripping" at the time of the offense.  He could not

specifically remember stabbing Mrs. B and murdering her son, but he remembered that he had

blood all over him and he knew something was wrong.  *Id.*  Brown told the parole board in 1991

that he thought he "committed the crimes, stabbed Mrs. B and killed her 5 y/o son." *Id.*  Brown

discussed the circumstances of the crimes because he knew what drugs and alcohol can do to a

person and did not want another young child's life taken in vain.  *Id.*

The court takes note of the scientific evidence advanced by Brown: the DNA evidence

that excludes Brown and Mrs. B's husband as contributors of male genetic material; the 2015

report that hair comparison analysis "exceeds the limits of science"; evidence concerning the

severe deficiencies in fiber examination; and blood analysis evidence.  This evidence does not

contradict the trial evidence or post-trial admissions pointing towards Brown's guilt.  For

example, the DNA evidence does not demonstrate that another person attacked Mrs. B.  At best,

it invites speculation about Mrs. B's sexual activities outside of her marriage.  Regarding the hair

comparison, the testimony would be limited to the expert's statement that two hairs on the

sweatshirt had the same characteristics as Brown's hair, but would have to include that the expert

could not definitively identify Brown as the source of the hair.  The fiber analysis testimony

39

would have to be more limited than before, because the agent's testimony that color and shade could be identified just with a microscope is scientifically unsupportable; research has shown that seven different shades of blue cannot be visually distinguished by microscopy. The admissible evidence would be that the fibers were made of the same type of material and that such materials were then used by 50 different manufacturers. Finally, the blood analysis evidence at trial, to begin with, was limited because Brown and the victims all had Type A blood. Brown also cites a 2012 study that contradicts the testimony at trial that there was blood spattered on the sweatshirt Brown was alleged to be wearing. At best, this evidence is equivocal as to guilt, and it does not undermine the strong evidence of guilt set forth above. In sum, none of this evidence makes it "more likely than not that no reasonable juror would have found the petitioner guilty beyond a reasonable doubt." *Teleguz*, 689 F.3d at 328 (quoting *Schlup*, 513 U.S. at 327).

### III. CONCLUSION

For the above reasons, the court will grant respondent's motion to dismiss and deny the petition for a writ of habeas corpus. Further, concluding that Brown has failed to make a substantial showing of the denial of a constitutional right as required by 28 U.S.C. §2253(c)(1), a certificate of appealability will be denied. An appropriate order will be entered.

Entered: March 31, 2021.

/s/ Elizabeth K. Dillon
Elizabeth K. Dillon
United States District Judge